**STATE of Missouri, Respondent,**

v.

**Leon GRIMM, Appellant.**

**No. 55591.**

Supreme Court of Missouri,
Division No. 1.

Jan. 11, 1971.

John C. Danforth, Atty. Gen., Thomas H. Stahl, Asst. Atty. Gen., Jefferson City, for respondent.

John R. Barsanti, Jr., St. Louis, for appellant.

WELBORN, Commissioner.

Appeal from denial of relief from three consecutive life sentences for murder, first degree, robbery and rape.

At about 6:00 P.M., December 5, 1962, Mrs. Betty Foster was struck in the head with a baseball bat in an alley near the parking lot at her place of employment in St. Louis. She was dragged to a nearby lot where she was raped and robbed. Her attackers then dragged her back to the parking lot and left. Mrs. Foster was found unconscious on the parking lot at around 10:30 P.M. on the date of the attack.

At about 9:30 P.M. on December 7, 1962, Leon Grimm was picked up by St. Louis police on suspicion of involvement in the attack on Mrs. Foster. He was taken to police headquarters and on questioning there, Grimm admitted that he and Ellis Coney had planned to attack Mrs. Foster in order to rob and rape her. Coney slashed a tire on her auto on the parking lot and when she got out to examine the flat tire as she was driving away from the parking lot, Coney struck her with a baseball bat and the rape and robbery followed.

On December 10, 1962, affidavits were filed in the St. Louis Court of Criminal Correction, charging Grimm with robbery in the first degree with a deadly weapon, forcible rape and assault with intent to kill with malice. Mrs. Foster died on December 16 and a charge of murder, first degree, was filed in lieu of the assault charge.

On January 3, 1963, grand jury indictments were filed charging Coney and Grimm with murder, first degree, robbery, first degree, with a deadly weapon and forcible rape.

Grimm was arraigned on the charges on January 4, 1963. At the arraignment, a Public Defender appeared with defendant and a plea of not guilty was entered to all charges.

In February, 1963, a judge of the Circuit Court of the City of St. Louis ordered Grimm transferred to the State Hospital at Fulton for mental examination. Before the transfer occurred, the court appointed Mr. James W. Jeans to represent defendant. Mr. Jeans was notified of the appointment on February 14, and conferred with Grimm before the latter went to Fulton.

Examination at Fulton resulted in a diagnosis of: Chronic Maladjustment of Adolescence, in an impulsive, immature, intellectually and culturally deprived individual. No psychosis was found and the opinion of the hospital staff was that Grimm "knows the difference between right and wrong * * * and is able to consult with counsel in his own defense."

On May 9, 1963, Coney was found guilty of murder in the first degree by a jury in the St. Louis Circuit Court with a punishment of life imprisonment.

On June 17, 1963, Grimm appeared in the St. Louis Circuit Court with Mr. Jeans. The pleas of not guilty to the three charges were withdrawn, pleas of guilty entered and a life sentence imposed for each offense, the sentences to run consecutively.

Grimm filed a motion under Supreme Court Rules 27.25 and 27.26, V.A.M.R., to set aside his pleas of guilty and the judgment of conviction. An evidentiary hearing was held at which Grimm and Jeans testified. The trial court made findings adverse to appellant and this appeal followed.

On this appeal, five challenges to the trial court's findings are advanced.

1. The court erred in finding that the incriminating statement made by appellant on December 7, 1962 was not taken contrary to law, was voluntary and was given after appellant had been advised of his constitutional rights.

2. The court erred in finding that the total deprivation of legal counsel to appellant for 69 days after his arrest was not a deprivation of due process of law.

3. The court erred in finding that appellant's pleas of guilty were knowingly and voluntarily entered.

4. The court erred in failing to find that the totality of the deprivation of due process under the facts of the case required the sentences to be vacated. Circumstances which should have been considered include the questionable nature of the incriminating statement, the excessive and prejudicial publicity, the deprivation of counsel during the critical stages of the proceeding and the failure to comply with Supreme Court Rule 25.04, V.A.M.R.

5. The court erred in failing to find that the three consecutive life sentences were invalid as constituting cruel and unusual punishment.

I.

The conviction in this case having been based upon pleas of guilty, the fundamental problem presented upon the application of the appellant is whether or not the pleas were knowingly and intelligently made. The starting point for determination of such issue is the record of the proceedings at which the plea was entered. There is no necessity to set out the proceedings verbatim. The record shows that the colloquy at the plea was between the court and Mr. Jeans. No inquiry was directed to or answered by appellant. Mr. Jeans informed the court that he had fully discussed the murder charge with appellant; that he had advised Grimm that he would be entitled to a trial by jury; that he had told appellant of the various charges against him and of the range of sentence which might be imposed and had acquainted him with the

possibilities available to him; that he had advised him in the murder case that if he were found guilty, there were only two possible verdicts, life imprisonment or death. The circuit attorney explained his recommendation of three successive life sentences on the basis of the life sentence imposed by the jury on Coney and the "mental background" of appellant. The inquiry on allocution was then addressed to Mr. Jeans and when he replied that he had no legal reasons why sentence should not be pronounced, a sentence of life imprisonment for murder was imposed. The court then inquired of Mr. Jeans whether the plea of not guilty on the robbery charge was being withdrawn and whether he had discussed the matter with appellant. Upon Mr. Jeans' affirmative answer and again upon his negative reply to the inquiry on allocution, sentence of life for robbery was imposed, to run consecutively with the murder sentence. Mr. Jeans then announced withdrawal of the plea of not guilty on the rape charge and entry of a plea of guilty. Again, upon Mr. Jeans' negative response to the allocution inquiry, the court imposed a life sentence for the rape charge, to run consecutively with the first two.

Such a record does not demonstrate a knowing, voluntary plea. Nor does it meet the requirements of Supreme Court Rule 25.04, V.A.M.R. Drew v. State, Mo., 436 S.W.2d 727. We therefore must determine whether or not the evidence adduced at the hearing met the burden which the inadequate record cast upon the state to come forward with evidence to show that the pleas were knowingly and understandingly made. Davis v. Swenson, W.D., Mo., 308 F.Supp. 635; Mountjoy v. Swenson, W.D., Mo., 306 F.Supp. 379.

The evidence on behalf of the state came from Mr. Jeans, a lawyer of wide experience in the trial of civil cases. He had previously served as appointed counsel in three other criminal cases, one of which went to trial.

Jeans testified that, upon hearing of his appointment as counsel for Grimm, he visited appellant in the jail. His primary concern at that time was to become acquainted with Grimm, appraise his demeanor and character as a witness and his recollection of the facts of the offenses with which he was charged. Shortly after the appointment, Grimm went to Fulton for the previously ordered mental examination. Jeans' work was then involved largely in investigating Grimm's background and getting information from persons other than his client. He talked with Grimm's mother on three occasions. He had a very lengthy interview with a Mrs. Tolan, a teacher at a special room in a school Grimm had attended. Grimm was under her tutelage for about two years and she had used him as the subject of a paper which she was preparing in working for a Master's Degree. Jeans interviewed persons at Missouri Hills who had known Grimm during his stay at that facility. He examined Grimm's school record. He also examined the files of the two St. Louis daily newspapers and noted their articles on the case.

Jeans interviewed numerous psychiatrists in an effort to get help from that standpoint. He conferred with a welfare worker who had some dealings with Grimm and corresponded with a sister of Grimm who he thought would most likely be of help to Grimm.

Jeans conferred with the circuit attorney and obtained a copy of the statement that office took from Grimm.

Mr. Jeans' recollection was that he conferred with Grimm four to six times.

Jeans testified that from his own investigation of appellant's level of intelligence, the reports of psychiatric examinations which had been made available to him and his own consultation with psychiatrists, he concluded that no submissible defense of insanity under Missouri law at that time was possible. Jeans did state that, although he knew that Grimm's I.Q. of 68 bordered on the moronic, he felt that

Grimm understood the discussions between them. "I thought that Leon * * * was comprehending things as we would talk together. I think that during my period of time as a lawyer I had had exposure to a great number of persons who did not have a lot of formal education and fell below the norm of sophistication and in talking with Mr. Grimm, many times his responses were rather curt, confined to monosyllables, but his responses were always consistent and I felt as if we were communicating. Although he did not verbalize to a great extent I thought that he was comprehending what I would say to him when I had the necessity of speaking to him."

Jeans testified that in his first interview with Grimm, he discussed the circumstances of the police interrogation following his arrest. His examination of the statement which he later obtained revealed no discrepancy as to what Grimm had said, the manner in which he had said it and the circumstances under which he had said it. Jeans testified that he believed defendant had understood what occurred at the police station after the arrest. "The interrogation seemed to be very natural. The response seemed to be natural." Jeans concluded that the state of the law was such that he did not think he would be successful in suppressing defendant's confession.

Jeans was aware of the problem which the extensive publicity given the case had created. However, he felt that any move for a change of venue should await indication that the state would insist upon a trial at which the death penalty would be demanded.

Jeans testified that he did discuss with Grimm the possibility of trial and told Grimm that trial was still available. He said that if, on June 17, Grimm had said, "Let's go to trial," he would have been prepared to do so. Jeans stated, however, that he felt that the chance of an acquittal was nil. He was convinced of Grimm's guilt and Grimm had admitted his guilt to him. Jeans was deeply concerned over the

prospect of a death penalty for Grimm, particularly since trial on all charges could have exposed Grimm to that possibility three times, on essentially the same evidence in a case with "many unfavorable jury factors."

Jeans also discussed the possibility of a plea with defendant. Apparently this discussion began after the trial of Coney. The circuit attorney had indicated to Jeans that since there had been no death penalty in the Coney case, the state would be agreeable to life sentences in Grimm's case.

Jeans testified that he talked to Grimm thirty to forty-five minutes before they entered the courtroom on June 17. He told Grimm that the state had offered to accept life sentences for each of the three offenses to be run consecutively. He told Grimm that a life sentence meant that he would be confined in jail until a parole board might feel that he was fit to return to society. Jeans stated that he did not hold out any hope of a parole within a specified number of years, telling defendant that likelihood of parole would depend upon many factors, including his behavior and rehabilitation in jail. Jeans stated that he was anxious to influence Grimm to "take the plea," and, although he had never indicated any particular willingness to follow Jeans' advice, he did on this occasion.

Jeans' testimony must, of course, be viewed in the light of the evidence offered by appellant. His evidence was that he had become seventeen years of age just two days before the Foster incident. He was the product of the St. Louis ghetto, the second youngest of a family of fourteen children. His mother was an invalid. The whereabouts of his father was unknown. The mother's income was primarily from public welfare. He attended school to the fifth grade, but had not been in school for some two years before December, 1962. He had reached the lower track of the fifth grade and was then moved into an ungraded sequence. He had held no job before his arrest. In 1960, he

had been found to be a delinquent because he had run away from home for extended periods on numerous occasions and been involved in stealing during his runaways. He was sent to Missouri Hills, a juvenile detention facility, and remained there until August, 1962.

He had left home about a month before the Foster attack and was "just living around." His mother was apparently unconcerned about his absence.

He testified that he was arrested by two policemen at around 7:30 or 8:00 P.M. on December 7. They told him that he was implicated in a crime involving Coney. Grimm denied knowing Coney and continued such denial during the ride in the police car to police headquarters. No questions were asked him about the specific crime during the ride. When he got to headquarters, he was taken into a room in which there were a number of policemen. The officers began to question him "about Coney and about Miss Foster, what happened that night." The only thing they told him that he remembered was, "You go ahead and tell the truth and make it easy on yourself." He said that he thought this meant that if he confessed he would "probably get a lesser time." He also thought it "would mean I might not get jumped on * * * because that's usually generally what happened that goes down there and don't cooperate with them as you would say." Thereafter he answered questions.

Grimm testified that he was not told that he did not have to make a statement, was not asked whether he wanted to see a lawyer, and was not asked whether he had anybody he wanted to talk to. He acknowledged that he was not threatened bodily, was not roughed up or cursed by the officers.

The transcribed statement showed that Grimm responded affirmatively to the following questions: "Do you know you don't have to make a statement?" "You gave this statement of your own free will?" "Do you know it can be used in Court against you?" and negatively to: "Has anybody threatened you?" "Has anybody promised you anything?" At the hearing he said that he did not recall those questions having been asked.

Grimm said that he remained at Central District until shortly before Christmas when he was transferred to the City Jail. He attended the coroner's inquest into Mrs. Foster's death. He talked to no lawyer until Mr. Jeans' visit on February 14. While in the City Jail, other inmates talked to him about his charges and expressed the opinion that Grimm might get the gas chamber.

Grimm stated that insofar as he recalled, Jeans on his first visit talked to him "about my charge and how I plead." He recalled no discussion about the penalties that might be imposed if he was found guilty. He did tell Grimm that he would probably go to the state hospital.

Grimm testified that the next time he saw Jeans was on the day he pleaded guilty. He talked to Jeans for a half hour or less "about time and my plea * * * I asked him about how much time would I get and he said I probably get life. And I say 'How much would I have to do on it?' He said 'You might have to do four, five years on it and get paroled.' So I said: 'I take it.'" He said that he remembered no discussion about a trial and that he did not know what he could or couldn't do as to a trial or what might happen with a trial. He said that he was "celling" with Coney at the time Coney went to trial and knew that he had gone to trial, although he didn't talk to Coney about what occurred at his trial because he was usually asleep.

■ Appellant's attack upon the trial court's finding that the pleas of guilty were knowledgeable and intelligent is based fundamentally upon the failure of the record at the time of the plea to demonstrate that the sentencing judge made adequate inquiry of appellant to provide the basis for a determination that the plea was

"made voluntarily with understanding of the nature of the charge." Supreme Court Rule 25.04, V.A.M.R. Appellant's reliance on Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274, on this issue is misplaced. Appellant's plea obviously antedated the 1969 Boykin decision. Boykin is not applied retroactively. Crego v. State, Mo., 447 S.W.2d 550; Bracy v. State, Mo., 456 S.W.2d 302, 305[3]; Moss v. Craven, 9th Cir., 427 F.2d 139; United States ex rel. Hughes v. Rundle, 3rd Cir., 419 F.2d 116, 118[3]; Meller v. Missouri, 8th Cir., 431 F.2d 120, 124[4]. Appellant argues further that, even if Boykin is not to be applied, nevertheless Boykin is nothing more than a statement of the requirements of Supreme Court Rule 25.04, V.A.M.R., in effect at the time of appellant's pleas.

Rule 25.04 has been involved in numerous cases involving attempted withdrawal of pleas of guilty or setting aside convictions based upon pleas of guilty. Although inadequacy of the record of proceedings at the time of entry of the plea has frequently been noted, we find no case in which the inadequacy of the record has provided the sole basis for relief, to the exclusion of inquiry into whether or not the plea was in fact voluntary and understanding. To the contrary " * * * [A] subsequent disclosure that the record does not demonstrate a substantial compliance with Rule 25.04 at the time the plea was accepted does not necessarily require, upon application by defendant, that the plea of guilty be set aside. * * * The issues before the trial court at the hearing on the motion, notwithstanding the failure of the record to show a determination prior to the acceptance of the plea as contemplated by Rule 25.04, are whether defendant's plea of guilty was in fact involuntarily made or whether it was made without an understanding of the nature of the charge. If neither of these circumstances is found to have existed no manifest injustice could have resulted from the acceptance of the plea." State v. Mountjoy, Mo., 420 S.W.2d 316, 323[4–8].

In Mountjoy v. Swenson, W.D., Mo., 306 F.Supp. 379, the court held that even Boykin does not, in proceedings collaterally attacking a conviction on a plea of guilty, limit the prosecution "to the record of inquiry made by the state trial judge in accepting the plea." 306 F.Supp. 384. See Davis v. Swenson, W.D., Mo., 308 F.Supp. 635.

■ The trial court in this case was, therefore, permitted to consider and pass upon the voluntariness of appellant's pleas on the basis of the record at the time of the pleas and of the evidence adduced at the hearing on the collateral attack. The trial court did find: " * * * [T]hat Grimm, knowing that he would be sentenced to life imprisonment in the event that a plea of guilty was entered, voluntarily authorized and directed his attorney to enter such pleas of guilty without coercion and without any promises of a parole; that Grimm did effectively waive a right to a trial by jury in each of the three cases and that the acceptance of those guilty pleas by this court did not violate any of Grimm's constitutional rights."

Appellant has not here attacked the factual basis of the court's finding on this issue. Viewing the entire record in the light of the burden which the inadequate record placed upon the state (Mountjoy v. Swenson, supra, 306 F.Supp. 384, footnote 1), we are unable to say that the trial court's findings are clearly erroneous. Supreme Court Rule 27.26(j), V.A.M.R.

## II.

■ Given the conclusion that appellant's plea was voluntary and intelligent, consideration of the issue presented by appellant's first assignment of error, i.e., the voluntariness of his confession, brings into play McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763. In that case the court held that "a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without

more, entitled to a hearing on his petition for habeas corpus." 397 U.S. 771, 90 S.Ct. at 1449. See also Parker v. North Carolina, *397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785.* Under the holding of those cases, there is no need to determine whether or not the confession was voluntary under the law as it stood in 1962. Certainly Mr. Jeans did what McMann v. Richardson holds that he was obliged to do. He made a good-faith evaluation of the admissibility of the confession. Although disagreeing with Mr. Jeans' conclusion (primarily on the basis of subsequent cases such as Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694), appellant does not dispute that Mr. Jeans' advice was "reasonably competent." "Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, supra, 397 U.S. 770–771, 90 S.Ct. 1448.

In this case, appellant relies heavily upon the circumstances that he was a young Negro of low intelligence and limited education who was not capable mentally of understanding or comprehending the situation upon his arrest, "particularly in the coercive atmosphere of a police station without counsel and without friends to advise him." However, appellant himself did not protest that he did not understand what occurred at the police station. He was aware that he was being interrogated about his responsibility for a crime. By his own testimony, he thought that the admonition to "make it easy on yourself" held out the prospect of a lesser punishment for his offense. Furthermore, appellant's argument ignores Jeans' testimony that, upon careful consideration, he concluded that appellant was aware of what was going on at the police station. It also ignores Jeans' testimony as to appellant's ability to comprehend his situation and to communicate with him.

The trial court's finding on appellant's mental status was "that although Grimm was operating within the dull average range of intelligence he did know the difference between right and wrong, understood the seriousness of the crimes for which he was charged and later sentenced and was able to contribute to, and cooperate in, his own defense, * * *." That finding is not clearly erroneous.

Appellant's evidence of his mental status was, therefore, not "something more" which would require, under McMann, further inquiry into the voluntariness of his confession.

### III.

■ Appellant's contention that the deprivation of legal counsel to Grimm for 69 days after his arrest was a deprivation of due process of law is without merit. The trial court found that appellant had not been prejudiced by the lack of counsel prior to the appointment of Mr. Jeans. The trial court recognized that there was no constitutional guarantee of right to counsel upon arrest. The in-custody interrogation took place three years prior to the Miranda decision. It further concluded that, under the decisions of this court, absence of counsel upon arraignment does not violate constitutional guaranties of right to counsel, absent some action at that stage, prejudicial to the rights of the defendant. See State v. Donnell, Mo., 430 S.W.2d 297, 299–303; Collins v. State, Mo., 454 S.W.2d 917, 919 [4]. In fact, the Public Defender did appear with defendant upon his arraignment and a plea of not guilty was entered on behalf of defendant. Absent more, this occurrence would be no basis for relief in this proceeding.

■ Appellant argues about lack of counsel at arraignment proceedings in the

Court of Criminal Correction on December 10 and December 18. The record does refer to "arraignment" on those dates, although it could not have been a formal arraignment inasmuch as the indictments charging appellant were not returned until January 3. Supreme Court Rule 25.04, V. A.M.R. Again, appellant has not demonstrated that any proceeding prejudicial to his right to a fair trial occurred at the December 10 and December 18 proceedings. Nor has he shown that he was prejudiced by his appearance without counsel at the coroner's inquest on December 18.

Appellant has not shown that the trial court's finding on this issue was clearly erroneous.

### IV.

■ The argument based upon "the totality of deprivation of due process" is without merit. Even if the assumption should be made that the statement of appellant was inadmissible, there is no proof that the admissibility or inadmissibility of the statement was a significant factor in the plea of guilty. Mr. Jeans did consider whether or not the statement was admissible. However, there is nothing to indicate how such determination weighed upon the ultimate advice which he gave appellant. The record is silent as to the strength of the state's case without the statement.

The element of excessive and prejudicial publicity was likewise considered by Jeans. However, its significance would have become important only in the event of a trial. Jeans was prepared in that event to take what action appeared called for on account of the publicity. However, without a trial, the publicity afforded no basis for action. Appellant did testify that he observed television broadcasts dealing with the case in which the possibility of a death sentence was mentioned. However, appellant was fully aware of the possibility of such a sentence.

The issue of lack of counsel prior to Jeans' appointment and failure to comply with Supreme Court Rule 25.04, V.A.M.R., have been considered. Considered either separately or cumulatively, none of those matters call for the relief here sought. The trial court's so finding is not clearly erroneous.

### V.

■ Appellant cites no authority in support of his contention that the cumulative life sentences imposed upon him constitute cruel and unusual punishment and denial of due process of law under state and federal constitutional provisions. This proposition has been rejected in other jurisdictions. See State v. Maxey, 42 N.J. 62, 198 A.2d 768; State v. McNally, 152 Conn. 598, 211 A.2d 162, cert. den. 382 U. S. 948, 86 S.Ct. 410, 15 L.Ed.2d 356; Chavigny v. State, Fla.App., 112 So.2d 910, cert. den. (Fla.) 114 So.2d 6, cert. den. 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742; State v. Bruce, 268 N.C. 174, 150 S.E.2d 216. Annotation—"Comment Note—Length of Sentence as Violation of Constitutional Provisions Prohibiting Cruel and Unusual Punishment." 33 A.L.R.3d 335, 368–369. These cases are premised on the theory that a sentence within statutory limits cannot as a matter of law be held cruel and unusual punishment when the statute authorizing the punishment is not invalid. Missouri cases support this principle in cases involving other than life sentences. State v. Cook, Mo., 440 S.W.2d 461, 463 [1]. There is no valid reason for not applying the same principle in a case involving cumulative life sentences, as has been done in the above-cited cases from other jurisdictions.

Judgment affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.