Thaddeus Francis BRODKOWICZ,
Appellant,

v.

STATE of Missouri, Respondent.

No. 56475.

Supreme Court of Missouri,
Division No. 1.

Dec. 13, 1971.

Motions for Rehearing or to Transfer to Court En Banc Denied Jan. 10, 1972.

Haseltine & Springer, Horace S. Haseltine, Springfield, for appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

HOUSER, Commissioner.

Thaddeus Francis Brodkowicz appeals from an order denying his Criminal Rule 27.26, V.A.M.R., motion to vacate a 15-year sentence entered upon a plea of guilty in 1963 to a charge of first degree robbery. His pro se motion, filed in February, 1969 and amended in August, 1970 shortly after the appointment of counsel, alleged (1) that his plea was involuntary and induced by coercion, threats, ignorance, fear, promises of lenience and promises of his counsel that he would receive a 10-year sentence; that his plea was entered through inadvertence and without a clear understanding of the charge; that he was subjected to physical brutality and abuse, torture, harassment, intimidation, threats and prolonged solitary confinement to compel a guilty plea; (2) ineffective assistance of counsel during arraignment, plea and sentencing and (3) failure of the sentencing court to comply with Criminal Rule 25.04 before accepting the guilty plea.

Movant, 21 years of age, was arrested December 17, 1962 and charged under the Second Offender Act. He waived a preliminary hearing. On January 3, 1963 he was arraigned. On that date two attorneys were appointed to represent him. He pleaded guilty February 20 and was sentenced on March 1, 1963.

### EVIDENCE SUPPORTING THE MOTION

Movant testified as follows: On December 30 he and fellow prisoner Danny started a "ruckus" in their cell on the second floor of the jail, expecting that they would be transferred to solitary confinement and intending to escape before they reached "the hole" downstairs. On the way to the hole the jailer without any provocation kicked movant in the back. Movant pulled out a blackjack he had made and the two fought, the jailer swinging his keys and movant swinging his blackjack. An officer came up from behind, hit movant on the head with a blackjack, knocked him down and disarmed him. Other officers, called, took the two prisoners to the hole and there they were "worked over" with fists and blackjacks. Movant was struck over the kidneys. As a result of the fight and beating he was black and blue, had a cut on the side of his head, was bleeding, and for two days passed blood in his bowel movements. He received no medication. After movant's arraignment he and Danny were placed in "dry cells" (cells with a toilet and a bed but no running water) on the second floor. On or about February 10, 1963 movant and Danny broke up a steel bowl and fashioned cutting tools. Danny tried to cut the back plate off the lock in his cell. Movant tried to cut a bar out of his cell door. The jailer, who caught them in the act, required them to hand out everything in the cell, including their clothes. The jailer returned with 5 or 6 deputies. One of the deputies entered movant's cell with a leather belt 2 or 2½ inches wide, a half inch thick and 2½ or 3 feet long. It had a buckle on it. He said "You're acting like a little kid. We're treating you like a little kid." When he

threatened to hit movant in the face movant put his hand up in front of his face, whereupon the deputy struck movant on the testicles with the leather strap, and then struck him on the buttocks and back several times. Each blow laid open the skin, resulting in scars. Movant crawled on his hands and knees in an effort to get out of the cell. Another deputy hit him on the head with a slapjack, which is a flat blackjack 9 or 10 inches long, with a piece of metal which snaps back after it hits. Movant was nude and unarmed and was rendered unconscious. He struck no one on this occasion. One of the blows ripped the scab off his head, which started bleeding again. He had 4 or 5 lumps on his head. In a matter of minutes the sheriff appeared. He was irritated; mad; he called movant a foreigner (movant was from Chicago) and said he did not like people out of the state coming there trying to tear his jail down; that movant better get his a—— out of there and get over to the penitentiary, where he "would be better off"; that the sheriff ran the county and would see to it that he got 50 years; that he had other charges of attempted escape and assault he would bring if he didn't get out of the jail; that these charges would be placed against him as a detainer and that he would never make parole. A doctor was called but did not respond. Movant was compelled to remain in the dry cell without clothes, bedclothes or mattress. He slept on the steel bed without any blankets or cover. Thereafter until the day he went to the penitentiary he was naked night and day, except that he was given clothes to wear when his lawyers came to interview him.

He saw his lawyers a few days after the second encounter with the officers. They knew about the escape attempts. They told him that the way things were going, with the confession and the escapes, he wouldn't stand a chance if he went to trial and would probably get life imprisonment; that his best bet was to plead guilty and throw himself on the mercy of the court. He told them he would think it over. A few days later he talked to his lawyers again. He

wanted to know what he would get and they said he would get 10 years. Movant thought the attorneys had reached a 10-year agreement with the prosecuting attorney or the court. He considered it a "guarantee" that he would only get 10 years.

Movant testified that in his preplea conferences with counsel he did not complain to them about the beatings. He figured he was "in the wrong" so he said nothing about it, but they could see his physical condition. He conceded that counsel advised him as to his rights, including right to a jury trial and the range of punishment, and that he told them that he had signed a written confession. He testified that the confession was not coerced or given for promises but voluntarily given after warning that it might be used against him. They discussed trial and at their first meeting the attorneys did not encourage him to plead guilty.

Movant was corroborated to some extent with reference to the happenings on February 10 by the oral testimony of fellow prisoner Ramsey, who declared that he heard a commotion in the hall, observed 4 or 5 deputies, and saw movant and Danny in the nude; that they were kept nude thereafter; that the deputies were arguing with movant and Danny about cutting a door and tearing up the jail; that the deputies threatened to beat them; that movant was struck with a slapjack on the head once, and on the back 2 or 3 times, while his hands were up against the wall; that neither movant nor Danny struck any of the deputies; that movant's back was bruised after this beating; that the sheriff arrived, angry, shouting and complaining about tearing up his jail. Ramsey saw no leather strap used and failed to confirm the threats allegedly made by the sheriff.

A written statement by Rex Peck, a prisoner at the jail on February 10, admitted in evidence for the consideration of the court, corroborated movant in these respects: Peck heard a commotion and saw the jailer in the hallway "cussing" Danny. Six deputies arrived. Danny was whipped. He heard the deputies beating movant, who

was nude. His back was bleeding and had welts on it. One of the deputies hit him in the face with his open hand and knocked him back against the toilet. The sheriff appeared the next day. The sheriff was yelling. He called movant a foreigner and said he was going to break them of the habit of coming into Greene County and raising hell; that the judge was a personal friend of his and would do anything he recommended and he was going to recommend 50 years unless movant pleaded guilty and got out of his jail; that he referred to the possibility of filing other charges against him.

The record of the proceedings at the time of the plea shows that the court inquired whether defendant had had a chance to discuss the case with his court-appointed lawyers; whether they had explained the crime to him and the possible punishment; whether after consulting with them and being advised by them he was ready to answer the charge against him. After receiving affirmative answers from movant the court read the charge, explained that it was a charge of first degree robbery and asked how he wanted to plead, guilty or not guilty. No inquiry was made about promises or threats, his understanding as to what sentence he would receive, whether he was entering the plea voluntarily, or with respect to his treatment in jail awaiting trial. The court ordered a presentence investigation and later sentenced movant to 15 years' imprisonment. Movant testified that his lawyers did not make any attempt to withdraw the plea of guilty, and that he had no opportunity to converse with his counsel about withdrawal of the plea.

### THE STATE'S EVIDENCE

The two attorneys who represented movant testified as follows: Before the arraignment they talked to movant 10 or 15 minutes, told him what he was charged with and asked him how he wanted to plead. Thereafter they had several meetings— from five to eight—with movant. They investigated at the prosecuting attorney's office, read the State's file, including movant's confession and past record; saw the police reports. They asked movant about his background, wrote letters to his father (never answered); and talked to the victim, who identified movant as having robbed him. Movant confirmed the truth of the confession and that it had been given voluntarily, after receiving a warning that it might be used against him. Counsel considered it admissible in evidence. Movant never discussed any beatings received at the hand of the officers. The attorneys did not observe any marks on him. Counsel denied that any promises were made to movant as to what the sentence would be if he pleaded guilty; denied that they told him that he would get 10 years on a plea of guilty. They advised him that the judge would set the punishment, and that he would be better off to take a severance. Counsel denied that they told movant that if he went to trial he did not stand a chance. Counsel offered to try the case if that was what he wanted. He could have a trial or enter a plea "whichever he wanted to do." It was his decision, not his attorney's, that he plead guilty. The attorneys made no attempt to use any type of persuasion on him. They denied telling him that if he went to trial he might get a life sentence, although they did inform him of the range of punishment. Counsel had no knowledge of and movant did not inform his counsel about any threats alleged to have been made by the sheriff to movant. After the sentence one of movant's attorneys pleaded for a lighter sentence on the theory that movant's codefendant, in a trial before a jury, received only a 5-year sentence, and that the rule of uniformity in judgments should be observed in criminal actions.

Jailer Plank, a deputy sheriff, testified to these facts: On the first attempted escape movant had a club under his shirt, made from a handle off a mop bucket. He drew it from under his shirt, drew back to hit Plank with it and told Plank to get in the cell; that he was going to lock him up. When movant raised the club to hit him the jailer struck movant with a bunch of 15 or

16 jailhouse keys, hitting movant on the head, drawing blood. Plank got movant by the throat, choked and subdued him, and took him downstairs and placed him in the hole, "more for reasons of security than anything else." There was no beating of movant after he and Danny were placed in the hole. The officers dressed his head and cleaned him up. The sheriff came over to the jail and had a conversation with movant, in which no threats were made and there was no discussion about pleading guilty. Thereafter, on February 10, Plank heard noise on the second floor, to which movant had been transferred. Upon investigating Plank discovered two bars in movant's cell sawed half in two. Danny had cut the working parts of the lock on his door. Plank called Lt. Hutchinson, a deputy sheriff. Two or three other deputies arrived on the scene. The officers stripped the prisoners of their clothing and placed them in solitary confinement until the cells were repaired. A search of the cells disclosed a steel bowl torn into pieces, which were used to cut the bars. Movant was not beaten at that time but Lt. Hutchinson "batted" movant with a leather strap, that is, he "spanked him good with it" across his hind parts. No one hit movant with a blackjack or a slapjack and no one but Lt. Hutchinson struck him. The sheriff was not there that night. There was no conversation between movant and the sheriff in Plank's presence thereafter. Plank never threatened movant about pleading guilty and did not tell him what punishment he would get. Plank heard no one else threaten him or discuss this matter. Movant was not injured February 10; there were no cuts on his back, no bleeding, no cuts on his buttocks. Movant was spanked because he was stubborn and was trying to make a jail-break; he was spanked to keep peace in the jail.

Lieutenant Hutchinson testified to these facts: An attempt had been made to cut the bars and locks on the cell doors. The bars were partly sawed through. The cells were opened, the officers entered and searched the prisoners, stripped them and searched the cells, finding several pieces of metal which appeared to be from stainless steel eating utensils—bowls and plates. These articles were removed from the cell and Lt. Hutchinson took what he considered to be "appropriate corrective action," namely the use of the leather strap on the buttocks of the two prisoners. Movant was "spread-eagled" with hands against wall while the spanking was being administered. He struck movant 8 or 10 times, not on the head, but on the buttocks. He did not strike movant on the testicles. There was no other instrument such as blackjacks or slapjacks used. No fists were used. No one but Lt. Hutchinson touched movant. As a result of the strapping there were welts on movant's buttocks but there were no abrasions or cut places and no bleeding. The officer considered it necessary to administer this punishment to forcibly bring to his attention that assaulting officers and attempted jail-breaks "just would not be tolerated." There was no discussion of movant's case and movant was not told by Lt. Hutchinson or others that he would have to plead guilty. The sheriff was not present that night but was at home in bed. Alcohol was applied to the welts by a deputy at the lieutenant's direction. There was no conversation at any time between movant and sheriff in Hutchinson's presence.

■ Whether the plea of guilty was induced by coercion, threats, intimidation, etc. or by promises of a 10-year sentence depends upon whether movant's evidence or that of the State be accepted as the truth of the matter. The two versions of what happened are in sharp conflict on essential points. Whether movant and his witnesses were telling the truth or whether the attorneys and deputies are to be believed was peculiarly the function of the trial judge to determine in the first instance. He accepted the State's evidence, determined the credibility issue against movant, rejected the latter's evidence and entered detailed findings of fact, concluding that movant knowingly, intelligently, and voluntarily entered the plea of guilty; that the blow

struck with a blackjack on January 30 and the "paddling" of movant by Lt. Hutchinson on February 10 as a disciplinary matter, and the other circumstances surrounding movant's incarceration in jail, had no effect upon his subsequent plea; and that neither of the attorneys told movant what his sentence would be if he entered a plea of guilty. Discounting movant's version of what happened and accepting the officers' account of the facts surrounding movant's treatment at the jail (as the circuit court did and had a right to do) it nevertheless appears that movant was subjected to physical abuse and degradation, a situation we deplore and condemn. However, the issue before this Court is not whether the officers' conduct was justifiable. The narrow, dispositive issue is whether under all the circumstances the circuit court clealy erred in finding that the treatment accorded movant at the jail had no effect upon his entry of a plea of guilty. On that vital issue —whether the plea was voluntary or coerced by mistreatment—there was substantial evidence to support the findings and conclusion of the circuit judge. Movant entered the plea after numerous conferences with his two lawyers and after thinking it over for some time. He gave a confession, testified by him at the 27.26 hearing to have been given voluntarily and without coercion. He had the benefit of representation by competent counsel at the time he pleaded guilty. There is nothing to indicate that at that time he was in stress or strain, confused or under the influence of the treatment he received at the jail. The time lapse between the strapping and the plea diminishes the possibility of a nexus between the two. Neither the plea nor the sentencing was hurried. The sentence was not passed until nine days after the plea, during which time a presentence investigation was made. At no time during the conferences between movant and his counsel, or at the three court appearances (at arraignment, plea and sentence), or to the presentence investigator, does it appear that movant complained that he had been mistreated at the jail or indicate directly or indirectly that he was being or

had been impelled or coerced into pleading guilty by these experiences. This complaint was not registered until approximately three years after he started serving his sentence. A review of the entire record indicates that movant pleaded guilty because he *was* guilty; that he was not laboring under a mental compulsion to do so, and that the circuit court made no clear mistake in denying the motion on the suggestion of coercion.

Movant asserts in his brief that his written confession was procured by unlawful interrogation and unlawful search and seizure, and that he pleaded guilty without understanding that this evidence could not be used against him, ergo the plea should be set aside as having been induced by fear that the confession would be used at a trial. These matters were not raised in the original or amended 27.26 motion and therefore are not here for consideration. Had they been raised they nevertheless would have been inappropriate in this type of proceeding. We do not determine the validity of a search and seizure on a 27.26 appeal. Fields v. State, Mo.Sup., 468 S.W.2d 31, and cases cited l. c. 32 [1]. Nor can a confession, even though obtained illegally, be made the basis of a collateral attack upon a judgment of conviction entered upon a plea of guilty voluntarily and understandably made. Turley v. State, Mo.Sup., 439 S.W.2d 521, 525 [6].

## EFFECTIVENESS OF LEGAL COUNSEL

In the following respects the effectiveness of the assistance of movant's lawyers is challenged: (1) Their failure to inquire into the treatment of movant in the county jail and the effect such treatment had on his plea of guilty. We find no fault with counsel in this respect. Movant made no complaint to his attorneys about his treatment in jail. This fact was verified by the attorneys and admitted by movant. The attorneys did not observe any marks or bruises or injuries on any occasion when

they interviewed movant. The attorneys were not made aware of the claim that the sheriff had threatened movant. Counsel may not be convicted of dereliction of duty in connection with circumstances not brought to their attention, in the absence of an independent duty to investigate.

(2) Failure to effectively inquire into the admissibility of the confession, under a claim of illegal search of an automobile and interrogation without adequate warnings. No such failure has been shown. The record intimates that one of movant's lawyers talked to the three detectives who took the confession, and clearly shows that the lawyers asked movant if the confession was true; that he said that it was true and that he had given it voluntarily, knowing that it would be used against him; that he was so warned before giving it. At this hearing movant conceded that the statements in the confession were true and that he gave the confession voluntarily, without coercion or inducement. The lawyers considered the question, inquired into the facts, and concluded that the confession was admissible in evidence. There is nothing to show that they did not make a good faith evaluation of the admissibility of the confession, or that the advice given was not "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1448–1449, 25 L.Ed.2d 763, 773; State v. Grimm, Mo.Sup., 461 S.W.2d 746.

(3) Failure to move to vacate the judgment and sentence, if they believed that the sentence was unjust or not fair. The sentence was well within the limits of punishment for first degree robbery. Movant did not complain of the severity of the sentence, and did not request his lawyers to try to get the sentence vacated. There was in fact no ground for vacation of the judgment and sentence. One of the lawyers, Mr. Beezley, who did not consider the sentence too severe for the crime involved but did consider it "too stiff" in view of the fact that movant's confederate, following a jury trial, was sentenced to only 5 years' imprisonment, did orally plead with the court, suggesting a lighter sentence. He pointed out facts indicating that the confederate was more seriously implicated in the crime than movant and argued that the rule of uniformity of verdicts in the civil law should apply in criminal cases, and that movant should get the same sentence the confederate received. In spite of Mr. Beezley's plea the court remained unmoved.

■ (4) No effective inquiry at the hearings. It is the duty of the court, not counsel, to conduct the hearings, and counsel may not be impeached for any failure on the part of the court to conduct a sufficient inquiry into the facts at the time the plea is entered or the sentence is passed.

Appointed counsel, tried, have not been found wanting. The court's finding that movant received effective assistance of counsel during all stages of the proceedings is strongly supported by the evidence of record, is not clearly erroneous, and is clearly justified.

■ Movant makes the point that the record made at the time the plea of guilty was entered does not demonstrate that the court inquired into the question whether the plea of guilty was voluntary and made with intelligent understanding of the courses open to him; that the record is silent on such matters. He relies upon Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, and Criminal Rule 25.04, V.A. M.R. Movant's plea having antedated Boykin and Boykin not being applied retroactively, State v. Grimm, Mo.Sup., 461 S.W. 2d 746, and cases cited l. c. 752 [1], we consider whether the plea of guilty must be set aside solely on the ground that the admittedly sparse record fails to demonstrate a substantial compliance with Criminal Rule 25.04. Grimm rules this same point adversely to this contention, citing and quoting from State v. Mountjoy, Mo.Sup., 420 S.W. 2d 316, 323 [4–8], to the effect that notwithstanding the failure of the record to make the proper showing, if at the hearing on the 27.26 motion it is found that in fact the plea

was not involuntarily made or was not made without an understanding of the nature of the charge, no manifest injustice could have resulted from accepting the plea. Under Grimm the trial court was authorized to determine the question of voluntariness and that of movant's understanding on the basis of the record at the time of the plea "and of the evidence adduced at the hearing on the collateral attack." 461 S.W.2d, l. c. 752 [2].

■ Finally, movant would have this judgment and sentence set aside because the trial judge overruled his several motions to order payment by the State of $275 demanded by the federal authorities to defray expenses of transporting movant's witness Rex Peck from the federal penitentiary at Leavenworth, Kansas to Springfield, Missouri so that he could appear personally and testify as a "key witness" to the severity of the beatings, and the threats and treatment of movant in the jail. The record shows that the court upon application issued a writ of habeas corpus ad testificandum for the body of Rex Peck directed to the warden of the federal penitentiary at Leavenworth, Kansas, and that the federal authorities were willing to surrender the prisoner for the purpose of coming to Missouri to testify, if the State would advance the expense money. Movant relies upon Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, for the proposition that an indigent has the same rights as a nonindigent to post-conviction remedies, and Gardner v. California, 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed. 2d 601, for the proposition that the due process clause and equal protection of the laws clauses require the preparation of a transcript on appeal at state expense, and argues by analogy that the payment of funds to provide movant with a fair hearing is required, including the right to the presence of eyewitnesses from outside the jurisdic-

tion to testify to facts crucial to his cause. Movant cites no cases requiring the state to pay such expenses and we are aware of none. Nor does the record show that the failure to have the benefit of Peck's personal appearance prejudiced movant. Peck's story, graphically related in his written statement, was admitted in evidence and considered by the court. His testimony delivered personally would have been merely corroborative and cumulative. Since the court rejected movant's testimony and that of witness Ramsey, both of whom appeared personally, it is unlikely in the extreme that by hearing Peck testify in person the court's findings would have been any different.

Judgment affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HOLMAN, P. J., and BARDGETT, J., concur.

SEILER, J., concurs in separate concurring opinion filed.

SEILER, Judge (concurring).

I know of no warrant for the jailers to hold kangaroo court and decide the punishment for assault and attempted jail break, and I am skeptical about a guilty plea taken from a defendant who concededly has been whipped with a leather belt while forced to spread-eagle himself against the wall and kept naked in a "dry cell" over a period of weeks in the dead of winter, because such attitude on the part of the jailers and treatment at their hands has an element or quality of coercion fixed in its very nature.[1]

---

1. This was the second case heard in three days by Division One in the September 1971 term involving claim of coercion by a prisoner in the "dry cell" in the Greene County jail. The other case is 472 S.W.2d 342, Lansdowne v. State, decided November 8, 1971, where defendant was kept in solitary confinement in the dry cell for over seven months.

Proper inquiry by the court, under Rule 25.04, at the time of the guilty plea would have uncovered these undisputed facts. Had such inquiry been made, I am sure the court would not have left the question hanging in the air as to whether the treatment received by the defendant affected the voluntariness of the guilty plea.

However, my colleagues, who, needless to say, also disapprove of what went on in the Greene County jail, do not believe it can be said on the record before us that the court clearly erred in holding the jail treatment had no effect on the guilty plea. The question is a close one, but I defer to their judgment and concur.