**Allen L. POLK, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 57555.**

Supreme Court of Missouri,
Division No. 1.

March 11, 1974.

Bernard Passer, Kansas City, for appellant.

John C. Danforth, Atty. Gen., William F. Arnet, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Commissioner.

Appeal from denial, after evidentiary hearing, of motion under Rule 27.26, V.A. M.R. to vacate and set aside judgment of conviction and sentence to life imprisonment for murder, first degree. (Appeal taken prior to January 1, 1972.)

On March 4, 1969, Allen L. Polk, charged by indictment filed June 20, 1968, with murder, first degree, came on regularly for trial, represented by Mr. J. Arnot Hill of The Legal Aid & Defender Society of Greater Kansas City. Mr. Hill stated to the record that on October 9, 1968, at his request, his client was ordered to undergo mental examination at Western Missouri Health Center; that the results, certified in a report to the court, showed that defendant did not have, at time of report, time of examination, or time of the alleged crime, a mental disease or defect; that defendant did not intend to rely upon mental disease or defect as a defense, and was not requesting a hearing on that issue. The court read the report and found that defendant was not suffering from mental disease or defect.

Mr. Hill next called defendant's Motion to Suppress Oral and Written Statements and requested a hearing. The court accorded the requested hearing at which defendant and Officer Earl Horner testified, and after which the court overruled the Motion to Suppress.

Mr. Hill then stated that he had advised defendant to plead guilty in the event the court denied the Motion to Suppress; that he had consulted with defendant on two occasions; that Mr. Bunch from his office also had talked to defendant as had one other lawyer; that with the lack of a mental disease defense and the court's denial of the Motion to Suppress, he could see no defense and advised defendant to plead guilty. The following transpired:

"MR. HILL: First of all, Mr. Polk, are you going to follow my advice and enter a plea of guilty? DEFENDANT POLK: Yes. MR. HILL: And you're asking the Court to permit you to withdraw your plea of not guilty and enter a plea of guilty? DEFENDANT POLK: Yes.

"MR. HILL: What is your age? DEFENDANT POLK: Nineteen. MR. HILL: And how far did you get in school? DEFENDANT POLK: Twelfth grade. MR. HILL: And you are not a narcotic addict? DEFENDANT POLK: No, sir. MR. HILL: And you're not under the influence of narcotics or of any medication at the present time? DEFENDANT POLK: No, sir.

"MR. HILL: On the 4th of June, 1968 did you attempt to rob an ice cream man? DEFENDANT POLK: Yes. MR. HILL: And did you later learn that his name was Michael J. Plaven? DEFENDANT POLK: Yes. MR. HILL: Will you tell us, first of all, what kind of a gun did you have, or if you had a gun, in your possession? DEFENDANT POLK: .22 caliber rifle. MR. HILL: Will you describe it fully? * * * DEFENDANT POLK: Short. Sawed off. * * * MR. HILL: Was it a bolt action? DEFENDANT POLK: Yes. MR. HILL: Now, you did not, as I understand it, intentionally shoot Michael J. Plaven? DEFENDANT POLK: No, sir. MR. HILL: Will you tell the Court just exactly how it happened that the gun went off and a bullet entered Michael J. Plaven? * * * DEFENDANT POLK: In talking with Michael J. Plaven, he was standing up at the time and I set the sawed off rifle upon the mantle and placed it up there. * * * and at this time he sat back and just looked at me and jerked his truck into gear and at that time the rifle was setting on the mantle and went off and discharged.

"MR. HILL: Now, I have told you that there are only two punishments for murder in the first degree and one is life and the other is death.[1] You understand that? DEFENDANT POLK: Yes, sir. MR. HILL: And for the benefit of the record, Mr. Freeman, I have asked you on more than one occasion if you could reduce this charge from murder to robbery? MR. FREEMAN: That is correct, Mr. Hill and Your Honor, and I consistantly advised Mr. Hill in the event this case was tried, the State would request the death penalty. MR. HILL: And for the defendant's information I would like to state that I have gone over Mr. Freeman's head and talked to Mr. Lombardo who is the chief trial counsel, in an effort to get the case reduced.

"Now, you understand that the recommendation of the prosecutor or any recommendation that I might make, that these are not binding on the Court? DEFENDANT POLK: Yes, I understand. MR. HILL: By entering a plea of guilty there is nothing left for the Court to do, other than to sentence you? DEFENDANT POLK: Yes. MR. HILL: And the Court can only give you one of two sentences, either death or life sentence, you understand that? DEFENDANT POLK: Yes, sir. MR. HILL: And realizing these things you're now asking the Court to accept your plea of guilty? DEFENDANT POLK: Yes, sir. * * *

"THE COURT: Now, on the stand awhile ago you said you had a juvenile record. Have you ever been convicted of a felony before? DEFENDANT POLK: No, sir, not a felony. The people didn't prosecute but we were riding in a stolen car and I went to Little Blue. * * * THE COURT: Since then, have you been convicted in the adult courts of any offense? DEFENDANT POLK: No sir. * * *

"THE COURT: For the record, would you state your name? MRS. MADISON: Ernestine Madison. THE COURT: You're the mother of Allen Ladd Polk? MRS. MADISON: I am, yes, sir. THE COURT: Is there anything you want to state on the record? MRS. MADISON: No, sir. MR. HILL: I would like to answer, Your Honor. You have had a chance to talk to your son, Allen Ladd Polk, and he has had a chance to talk to you? MRS. MADISON: Yes, sir. MR. HILL: And I have also consulted with you? MRS. MADISON: Yes, sir. MR. HILL: And do you join with me in recommending that he enter a plea of guilty to the charge? MRS. MADISON: Yes, I do.

"THE COURT: Now your son has been examined by a psychiatrist and has been

---

1. Death was a viable penalty provision in this case because Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, rendering in-valid death penalty statutes such as that in Missouri postdated trial of this case.

found to be competent. In other words, he is in his right mind and he knows what is going on here. Do you feel there is anything wrong with him, mentally? MRS. MADISON: I do. I certainly do. I always have but they said there is not, so— THE COURT: What do you think is wrong with him? MRS. MADISON: Well, I think he is mental. THE COURT: Well, you heard— MRS. MADISON: Yes, they said not. THE COURT: You heard what the psychiatrist has said? MRS. MADISON: I have had him to the psychiatrist six or seven times, myself. THE COURT: How many times? MRS. MADISON: Three times. THE COURT: What did they say? MRS. MADISON: They told me the same thing. THE COURT: What? MRS. MADISON: That there was nothing wrong with him. * * * THE COURT: Do you think that he understands what he is doing here, today? MRS. MADISON: Yes. THE COURT: Do you have any doubt about that? MRS. MADISON: No, I don't have any doubt.

"THE COURT: What about you, young man, do you understand what is going on here, today? DEFENDANT POLK: Yes. THE COURT: Are you claiming that you're mixed up in any way? DEFENDANT POLK: No, sir.

"THE COURT: Do you have anything, Mr. Freeman? MR. FREEMAN: By the way of supplementing. Your purpose in pointing the gun at Michael Plaven, the decedent, was to induce him to give you the money he was carrying in this ice cream wagon, wasn't it? DEFENDANT POLK: Yes, but I never got around to that point. MR. FREEMAN: You never got any money, I understand that, but you went there to rob him? DEFENDANT POLK: Yes, sir. MR. FREEMAN: You and Glen Ford went along. DEFENDANT· POLK: Yes. MR. FREEMAN: And it was only after you had asked for money that Michael Plaven sat down and the truck lurched forward or started to

move anyway, is that correct? DEFENDANT POLK: Yes.

\* \* \* \* \* \*

"MR. FREEMAN: * * * Judge, I think, that, of course, it would be the policy of our office, if the case were tried to ask the jury to return the maximum punishment and I know what the Court's feelings are but nevertheless in keeping with the office policy in this type of a case, we, of course, feel that punishment would not be inappropriate. THE COURT: You mean the death sentence? MR. FREEMAN: Yes, Your Honor. * * *

"THE COURT: Is there anything you want to say, Mr. Polk? DEFENDANT POLK: Yes, Your Honor, although Michael Plaven, he died, it was accidental. I didn't—I don't mean to say I'm not sorry he died or I was intentionally trying to kill him or would have killed him had he offered any resistance in this holdup attempt but as a result he was killed there merely as an accident.

"THE COURT: Well, the State's theory is this is a homicide committed in the perpetration of a felony or robbery and that's the position, that's the law and that of itself makes it first degree murder. MR. HILL: I have thoroughly explained this to the defendant and gone over this repeatedly, that the fact that he was engaged in a crime is substituting 'deliberation' and 'premeditation.'

"THE COURT: Is there anything you want to say, Ma'am? MRS. MADISON: No.

"THE COURT: Your plea is accepted. You're sentenced to the custody of the Missouri Department of Corrections for the remainder of your natural life."

The hearing on the 27.26 motion produced the following additional evidence:

Allen Ladd Polk identified himself as having been arrested at about 5:00 p. m., June 12, 1968, for the murder of Michael Plaven on June 4, 1968. He continued

with testimony similar to that given on his unsuccessful Motion to Suppress his statement prior to his guilty plea. In addition, he testified that "if I would give a statement they would break it down to second degree murder and I would have a bond." In the time between his arraignment and guilty plea, he saw his attorney "in about September or October * * * and * * * March 3rd twice," at which time he was asked to plead guilty. "I told him I was not going to plead guilty and he said the only thing against you is a statement and I told him we would attack the statement and he said he would do that but you should plead guilty and he left and I came down here and I seen my mother * * *. She said, 'Do as Mr. Hill said. He knows what he is doing' and I seen she was crying. She said Mr. Hill had told her I was going to get the death penalty * * * and I kept telling Mom, 'I'm not guilty' * * *." Mr. Hill did not advise that he was ready to try the case before a jury or of his right to trial by jury. Mr. Hill did advise that he would get life imprisonment on a guilty plea and that he could get a death sentence. He also said he would be out on parole within a year. On cross-examination movant stated his only complaint was that his guilty plea was "obtained through my mother. It was not voluntary." He had no testimony in regard to his allegation of undue delay. He gave Mr. Hill the names of three or four neighbors with him the night of the crime; he did not know whether his attorneys talked to them. At the plea proceedings he said only what Mr. Hill told him to say. He knew the facts of the crime only from statements of Floyd Edwards and Glen Ford read to him at the police station.

Ernestine Madison first learned of her son's arrest about three days afterward. She visited him every Saturday and he never said he was guilty. Mr. Hill called her the night before the trial and told her Allen's trial was the next day and he wanted him to plead guilty. The next day Mr. Hill asked her to ask Allen to plead guilty.

She did not remember any discussion of sentence. She told her son to do what Mr. Hill said to do. When she spoke to her son he said he would rather be shot down than go ahead with it. Her son finally said he would plead guilty to satisfy her; but he said, "I would rather go ahead and have a jury trial than do this."

J. Arnot Hill, a lawyer since 1936 and a veteran in the defense of criminal cases, was appointed to represent Allen Ladd Polk, indicted for the homicide of an ice-cream vendor. He discussed the case with the prosecuting attorney on several occasions, and was furnished a copy of his client's statement as well as a rundown of how the State's witnesses would testify. Both he and Mr. Willard Bunch interviewed the defendant and participated in representing him. He asked for the mental examination to determine whether a mental defense was available; he advised his client that he had two choices, either to plead guilty or stand trial. It was understood that if trial were chosen it would be to a jury. He used Mr. Bunch's interview to assist in his own interview, and "this defendant told me that he was out with, I believe it was two other people of his friends in a car; that * * * they saw the ice cream truck and this defendant and one of his friends got out of the car and the friend went up and ordered some kind of an ice cream confection, * * * this defendant followed him and he had tucked underneath his shirt in his trousers in his belt a bolt action .22 rifle which had been sawed off and that he, when he got to the ice cream vendor he said, 'This is a hold up' and he put the gun across the car and then according to what he said, the victim put the car in gear or the truck in gear and this caused the gun to go off which shot the victim in the head and our entire conversation then was around whether or not he was entitled to the defense of accident and I tried to assure him that he was not entitled to accident as a defense because he had killed somebody while trying to rob him. I talked to him at length

about this. I advised him that he had a right to a trial by a jury or a right to enter a plea of guilty before a judge, then in fact that he would be gambling in either event. * * *

"Now, there are quite a number of elements that go into what an experienced lawyer will take into consideration before he recommends a plea of guilty. In this case the defendant has to tell me that he is guilty. I have to be satisfied that the State can prove him guilty before I would make a recommendation and I recommended in his case that he enter a plea of guilty first of all, because if he appeared before a judge as a man who had confessed, he probably would not get the death penalty; that if he stood trial, in this case the victim of this case was a young white man and in all probability the case would be tried in front of an all white jury. Not only was he a young white man but he was a college student; he was somebody worthwhile and this makes a great deal of difference to a jury. * * * Never at any time did this defendant deny that he had committed the crime. His only contention was that he did not intend to kill him. He didn't want to shoot him, he just wanted to rob him and because this man had the unmitigated gall to put the car in gear and cause it to go forward and caused his gun to go off, then he felt that this was a defense.

"At that time I had his welfare in mind, I did not want him to get a death penalty and I felt that in this case if this case was tried in front of a jury without this defendant having a simulance of defense that it could very easily be that a jury would return the death penalty. * * * he kept insisting that he was not guilty of murder because he did not intend to shoot the man."

Mr. Hill was prepared to go to trial at any time, but decided to recommend a guilty plea when the mental examination showed defendant fit to proceed. He did not consider an alibi "because we had not been supplied with any alibi. I mean he had been arguing about whether or not he was entitled to accident and I couldn't—first of all, if I defended a case I cannot put on evidence that is false, knowing it to be false. Now, if he tells me that he committed the crime but is not guilty because of an accident, then even if you would come up with some alibi witnesses, then I could not put them on the stand but to my recollection he did not give me any alibi witnesses. Never at any time did this defendant deny to me or to anybody else, to my knowledge, that he was not the man who had the gun in his hand at the time the deceased was killed. His only defense was it was an accident, he didn't mean to kill him."

With respect to possible illegality of the confession, "To my knowledge I don't believe that it could be, but I don't know whether or not I was the man who, the lawyer who conducted the motion to suppress in the first place, however, the statement that he made to me was not at all in any respect inconsistent with the statement he made to the police department. I don't think his statement was the sole reason for my recommendation. It seems to me the State had other witnesses. I don't recall —it seems to me like the other occupants of the car were juveniles who were not proceeded on in the state court, that is in the trial court."

He discussed his recommendation that her son plead guilty with his mother as was his custom with young people. With respect to his recommendation, "he is advised of his full rights, that is that he can either stand trial in front of a jury charged with murder in the first degree or he could enter a plea of guilty before the Court for a charge of murder in the first degree and he was told what the minimum was and that is a life sentence; he was told what a jury could do and I don't know how much detail I went into as to what other instructions would be given if he was tried by a jury but I did feel this was a

case where it would be to his advantage to enter a plea of guilty. * * * I told him that he would receive a life sentence. I told him it was entirely up to the Judge but in my opinion he would not receive a death sentence and I don't believe that under any circumstances would he have received a death sentence."

Defendant accepted the recommendation after he consulted with his mother. The prosecuting attorney never offered any reduction. "Mr. Freeman was the Prosecutor and I think he even asked that the Court give him the death sentence after he pleaded guilty. I'm not sure. I know that in this case Mr. Freeman was pretty hot about the subject and Mr. Freeman wanted to go to trial."

In denial of relief to movant the court made a comprehensive recital of the evidence as well as findings of fact and conclusions of law on all issues.

Appellant contends the court erred because "(a) Defendant's Plea of Guilty was involuntary, unwilling, psychologically coerced and unknowingly entered without competent advice of counsel. (d) Defendant was denied effective assistance of counsel."

In development of this contention, appellant quotes at length from Goodwin v. Swenson, 287 F.Supp. 166 (D.C.Mo.1968); United States ex rel. Thurmond v. Mancusi, 275 F.Supp. 508 (D.C.N.Y.1967); State v. Reese, 481 S.W.2d 497 (Mo. banc 1972); and, to a lesser extent, Doepke v. State, 465 S.W.2d 507 (Mo.1971), and State v. Williams, 361 S.W.2d 772 (Mo. banc 1962). In an attempt to bring himself within these holdings, he asserts his version of the evidence that: "Promises had been made to Defendant by the Police Department and Mr. Hill to cause Defendant to give a statement as well as plead guilty; Mr. Hill only saw Defendant on one occasion in nine months which indicated he could not have prepared a defense; Mr. Hill admitted he had no defense to the charge; the Defendant was never advised that he had a

right to trial by jury as indicated from the transcript of the original record; the Defendant was told what to say by counsel when he appeared in Court; the Defendant denied guilt throughout the proceedings until he signed a statement for the Police after much harassment causing fatigue and then being promised a lesser charge by the Police; the Defendant denied guilt up to the moment of his plea and then only after pleas made to him by his mother at the request of Mr. Hill did he plead guilty to the charge with the understanding he would be out in one year."

The evidence of both plea proceedings and 27.26 hearing has been stated at length because it demonstrates that defendant voluntarily pleaded guilty to murder, first degree, and that he was not denied effective assistance of counsel. Accordingly, movant has not met his burden of establishing his grounds for relief; and the judgment in denial of relief is not erroneous. Rule 27.26(f), (j), V.A.M.R.; Crosswhite v. State, 426 S.W.2d 67 (Mo.1968).

Some of the evidence is in conflict; however, resolution of conflicting testimony was for the trier of the facts, and the court has chosen to believe counsel's version of the facts rather than that related by movant and his mother. Watson v. State, 475 S.W.2d 8, 12 [1] (Mo.1972).

In this posture, there was evidence from the plea proceedings to show, among other things, that: defendant knew the charge against him and described in detail how the crime was committed and how he participated in it; that he understood the punishment for his crime to be limited to death or life imprisonment; that he understood the nature and consequences of the plea proceedings; that he had counsel and understood the court was not bound by any recommendations of his attorney or the prosecuting attorney; that he was not pressured into pleading guilty. There was evidence at the 27.26 hearing to the same effect and also to show: that there were no promises made to induce defendant's

plea; that defendant was advised of and understood his right to jury trial.

This guilty plea antedated Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and that decision is not applied retroactively. State v. Grimm, 461 S.W.2d 746, 752 [1] (Mo.1971). Therefore, this plea is not judged by the standards of that case, State v. Grimm, supra; Williams v. State, 498 S.W.2d 521 (Mo. 1973); Meller v. State, 431 F.2d 120 (8th Cir. 1970); and the appropriate standard is Rule 25.05, V.A.M.R. The rule provides that a guilty plea shall not be accepted until it is first determined that the plea is made voluntarily with understanding of the nature of the charge. This record shows that the trial judge satisfied the requirements of the rule, and the evidence shows a voluntary guilty plea. Davis v. State, 499 S.W.2d 445 (Mo. banc 1973); Drew v. State, 436 S.W.2d 727 (Mo.1969); Mooney v. State, 433 S.W.2d 542 (Mo.1968). The only requirement of Boykin v. Alabama, supra, missing from the plea proceedings was a determination of defendant's knowledge that he was entitled to a trial by jury and this was satisfied in the subsequent 27.26 hearing. State v. Grimm, supra, 461 S.W.2d 1. c. 752 [2].

■ Appellant appears also to argue that his confession was not voluntary and therefore it tainted his plea. Defendant's confession was not mentioned in the plea proceedings; and an involuntary confession, if so, does not invalidate a guilty plea shown otherwise to be voluntary. Beach v. State, 488 S.W.2d 652 (Mo.1972); Abercrombie v. State, 457 S.W.2d 758 (Mo. 1970).

■ With respect to the effectiveness of counsel, there was evidence to show: that Mr. Hill and Mr. Bunch conducted more than one interview of defendant; that Mr. Hill discussed the case on several occasions with the prosecuting attorney in an effort to secure a reduction of the charge; that he examined the evidence in the State's possession, including defendant's confession, and noted its consistency with defendant's guilt; that he secured a psychiatric examination in exploration of a mental disease or defect defense; that he sought to suppress the statement given by defendant; that defendant did not disagree with Mr. Hill on the facts, and that their debate was on the defense of accident; that defendant admitted his guilt to Mr. Hill; that defendant did not furnish alibi witnesses, and that alibi was inconsistent with defendant's statement of how he committed the crime.

■ On this record, complete with a voluntary plea of guilty, it would be difficult to say what else counsel should or could have done. Kress v. United States, 411 F.2d 16 (8th Cir. 1969); State v. Turley, 443 F.2d 1313 (8th Cir. 1971). And with his client's admission of guilt it may not be said that counsel was ineffective for failure to pursue further investigation. Barylski v. State, 473 S.W.2d 399 (Mo. 1971).

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.